IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 29, 2010

## NEW SOUTH FEDERAL SAVINGS BANK v. BRENDA PUGH

**Appeal from the Circuit Court for Blount County**
**Nos. L-16579, L-16580     David R. Duggan, Judge**

**No. E2009-02150-COA-R3-CV - FILED NOVEMBER 29, 2010**

This is an appeal of two unlawful detainer actions consolidated below. New South Federal Savings Bank ("New South") filed separate detainer warrants against Brenda Pugh seeking possession of two non-adjacent properties conveyed to New South at a foreclosure sale instituted after Pugh[1] defaulted on a loan secured by a deed of trust on the properties. The general sessions court dismissed the actions. On appeal, the trial court rejected Pugh's challenge to the foreclosure. The court held in favor of New South and ordered that it be restored to possession of the properties. Pugh appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

William L. Gribble, Maryville, Tennessee, for the appellant, Brenda Pugh.

Ronald G. Steen, Jr. and Corinne E. Martin, Nashville, Tennessee, for the appellee, New South Federal Savings Bank.

**OPINION**

---

[1]The record reflects that the loan was taken out by Brenda Pugh and her husband, Carlton Pugh. Mr. Pugh died in October 2008 shortly after New South began foreclosure. Under the circumstances, we will refer to "Pugh" in the singular because New South does not seek any relief against Mr. Pugh's estate.

Pugh owned two tracts of land in Alcoa – one at 239 West Watt Street and another at 129 West Howe Street. The first was acquired in 1970 and included Pugh's personal residence and the second was a piece of property acquired in 1994. In November 1995, Pugh refinanced her mortgage with Liberty Trust Properties for $72,200. The deed of trust securing the note described both of Pugh's properties. Under the terms of the loan, Pugh agreed to make payments of principal and interest of $641.63 a month, beginning on December 6, 1995. The ten-year note included a balloon payment of $66,449.30 due on November 6, 2005. The loan was subsequently assigned to New South.

Pugh admittedly struggled to make the required payments. Beginning as early as December 1996, New South began to notify Pugh that she was in default. At least seven additional times between October 1997 and July 2007, New South sent notices of default and intent to accelerate to Pugh. Throughout the course of her dealings with New South, Pugh filed several Chapter 13 bankruptcy petitions, all of which were eventually dismissed.

In September 2008, counsel for New South wrote Pugh advising her that it had been retained to foreclose on her properties. On November 3, 2008, New South notified Pugh by regular and certified mail that the foreclosure sale for both properties was scheduled for December 8, 2008. The notice included a copy of the publication notice. Notice of the foreclosure sale was published in the Knoxville Journal on November 6, 2008, November 13, 2008, and November 20, 2008. Pugh was not present at the scheduled sale of December 8, and, in fact, the sale did not take place that date – counsel for New South announced at the scheduled time and place that the sale was postponed until January 6, 2009. New South by letter informed Pugh on December 23, 2008, of the rescheduled sale. On January 14, 2009, Pugh was notified that the sale was held as scheduled on January 6. The property was purchased by New South based upon its bid of $42,274.91. No other bidders were present.

New South filed its detainer warrants on January 22, 2009. The general sessions court entered judgments of dismissal on March 4, 2009. On New South's appeal, a bench trial was held in the trial court on June 30, 2009, at which hearing both parties appeared and presented evidence.

At trial, representatives of New South testified regarding Pugh's default. The last notices of default sent to Pugh in June and July 2007 advised her that if she failed to reinstate the loan by curing the default within 30 days of the notices, the remaining balance of the loan would be accelerated and the matter referred to the bank's foreclosure division for possible sale of the properties. The June notice stated that the loan balance was $65,448 while the July notice put the figure at $65,359.95. Each notice specified the sum required to cure the

default. Jim Mize, custodian of records for New South, surmised that the lower balance shown on the July default letter was the result of Pugh, either directly or through the bankruptcy court, making a payment on the loan after the June letter was sent. Mize testified that it did not "normally" take a year for New South to move to foreclose after it had sent a debtor notice of default that went uncured; he attributed the delay in Pugh's case to her multiple bankruptcy filings.

Phillip Jones, counsel for New South, testified that Pugh's properties were originally set for sale at foreclosure in September 2008, but that the sale was cancelled due to a pending bankruptcy filing. After the bankruptcy petition was dismissed, the sale was scheduled for December 8. Since Jones was confident that a subsequent bankruptcy petition filed by Pugh would also be dismissed, "instead of cancelling that sale, all of the ads were running and everything, so we felt that we were just preserving the status quo by just postponing the sale." As a result, the sale was postponed until January 6, 2009.

In her defense, Pugh testified regarding the loan and her financial struggles. She believed the loan was secured not by her personal residence, but only by the rental property on Howe Street; that it was a 15-year, not a 10-year note; and that these and other provisions of her loan contract had been changed after the documents were executed, but offered no proof in this regard. Pugh and her husband filed bankruptcy petitions in 1998, 2000 and 2002. After her husband's death, she again sought protection from the bankruptcy court in an effort to stop the planned foreclosure sale of her properties in September, November and December of 2008. Pugh explained that she had people who were willing to lend her some money to save her home, but she was never able to get an exact payoff amount from New South or its attorneys. According to Pugh, she constantly made efforts to work with New South to modify or reinstate her loan, but they refused. Asked whether she had ever actually tendered a lump sum payment in any amount to New South in an attempt to pay off the note, Pugh testified,

> I have tried, and I could not get them to give me a thing of how much I actually owed. They're saying . . .bankruptcy didn't pay them, they give me this figure and that figure and won't talk to me, being hateful and smart. They'd still write me letters telling me they can help me to reinstate it. They would not cooperate with me. They just stuck to me [sic] the deeds of trust . . . .

She acknowledged receipt of the 2007 notices reflecting a specific payoff amount, but stated that she did not tender payment then because she was "trying to get it all straightened out to really see what [she] did owe New South."

Pugh stated that she offered New South $42,000 in cash to pay off the note but did not indicate that she received any response. After the properties were sold at foreclosure, she received a letter from New South offering to sell them back to her for $92,300. She repeated that she had "tried" to tender payment to New South but never wrote them a check because "[t]hey've got to give me a figure to tender with."

At the conclusion of the hearing, the trial court rejected Pugh's various challenges to the notice provisions in the foreclosure process and sustained issuance of the detainer warrants in favor of New South. In its final order, the court set forth its findings:

> 1. The Knoxville Journal, wherein [New South] published its notice of foreclosure on the Properties . . . is a newspaper of general circulation in Blount County, Tennessee, and an appropriate newspaper for the publication of such notices.
>
> 2. New South gave [Pugh] proper notice, under the Tennessee statutes and its Deed of Trust, of the foreclosure sale originally scheduled on December 8, 2008, reserving the right in its published notice of said sale to postpone the sale without further publication upon announcement at the time and place given in the published notice.
>
> 3. Due to [Pugh] having filed bankruptcy after New South began its foreclosure proceeding, New South gave proper notice of postponement of its foreclosure sale until January 6, 2009, by announcing said postponement at the time and place of the originally scheduled sale.
>
> 4. The Court is not aware of any statutory law or case law that says that a foreclosure sale cannot be postponed upon the trustee being there at the date and time and announcing a postponement or adjournment. The Court finds that the Tennessee Court of Appeals decision [in] Conway v. Eastern Savings Bank . . . stands for the proposition that a foreclosure sale properly advertised according to the terms of the foreclosure statutes may be postponed without readvertisement in accordance with the precise terms of the statute.
>
> 5. [Pugh] did not, at any point after notice of default on the subject loan, tender or try to tender to New South the amount

-4-

necessary to pay off the debt, catch it up, bring it current, avoid
foreclosure, and/or redeem the subject property.

6. There is no proof before the Court that payoff amounts
provided to [Pugh] by New South were not accurate.

7. Upon the proof, New South's Foreclosure was proper and
there is no basis on which to set it aside.

In summary, the trial court held in favor of New South and restored it to possession of both
properties. Pugh's timely notice of appeal followed.

## II.

Pugh presents a single issue for our review that we restate as follows:

Whether the lower court erred in sustaining detainer warrants
against Pugh after New South foreclosed on her properties
without lawful notice of default.

## III.

When an appeal is pursued from a bench trial, our review of the trial's court findings
of fact is de novo upon the record. Tenn. R. App. P. 13(d). We accord these findings a
presumption of correction unless the evidence preponderates against them. *See id; Rawlings
v. John Hancock Mut. Life Ins. Co.,* 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). As to the
trial court's conclusions of law, however, there is no presumption of correctness. *Ganzevoort
v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

## IV.

Pugh challenges New South's authority to maintain the "unlawful" detainer actions
against her. She says that she was not given proper notice of default to trigger the
foreclosure process or of the foreclosure sale itself. As her argument goes, the sale at
foreclosure was thereby void, and New South never acquired the valid title necessary to
support the detainer actions.

Unlawful detainer actions concern the right to possession of property. An unlawful
detainer occurs "where the defendant enters by contract, either as tenant or as assignee of a
tenant, . . . willfully and without force, holds over the possession from the landlord, or the

assignee of the remainder or reversion." Tenn. Code Ann. § 29-18-104 (2000). As this Court has long observed, "[w]here the trust deed embodies the contract establishing the relation of landlord and tenant between the mortgagor and the purchaser at the foreclosure sale, a constructive entry by the purchaser, enabling him to maintain an unlawful detainer suit, attaches as soon as he acquires title." *Christmas v. Moore*, No. 03A01-9705-CV-00188, 1998 WL 372431 at *2 (Tenn. Ct. App. E.S., filed Jul. 6, 1998)(citing *Metropolitan Life Ins. Co. v. Moore*, 167 Tenn. 620, 72 S.W.2d 1050, 1051 (1934); *Griffith v. Brackman*, 97 Tenn. 387, 37 S.W. 273, 274 (1896)). "[I]n the unique case of foreclosures conducted under a power of sale, however, the landlord/tenant relationship may not arise when the trustee has exercised the power of sale in violation of the deed of trust." *CitiFinancial Mortg. Co. v. Beasley*, No. W2006-00386-COA-R3-CV, 2007 WL 77289 at * 7 (Tenn. Ct. App. W.S., filed Jan. 11, 2007). Applying these principles to the present case, the deed of trust expressly establishes the requisite landlord/tenant relationship to support New South's unlawful detainer actions provided, of course, that the foreclosure sale by which it acquired its title to the properties was conducted in strict compliance with the terms of the deed.

We begin with the relevant notice and advertisement provisions in the deed. Paragraph 21 provides, in bold letters, as follows:

> **21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law.**
>
> **If Lender invokes the power of sale, Trustee shall give notice**

**of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by applicable law, and Lender or Trustee shall mail a copy of notice of the sale to Borrower in the manner provided in paragraph 14. Trustee, without demand on Borrower, shall sell the property at auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any such sale.**

**\* \* \***

**If the Property is sold pursuant to this paragraph 21, Borrower, . . . shall immediately surrender possession of the Property to the Purchaser at the sale. If possession is not surrendered, Borrower . . . shall be a tenant at will of the Purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.**

Before this Court, Pugh makes no allegation that the letters she received in June and July 2007 did not serve as proper notice of default and of New South's intent to accelerate the sum she then owed. Rather, as we understand her argument, she takes the position that these otherwise proper default notices somehow became stale and ineffective because more than a year went by before New South began the foreclosure process. She further suggests that postponement of the sale left her with inadequate notice of the sale. In her brief, Pugh states:

> [A] default letter was initially sent out by New South on June 21, 2007; another default notice with a significantly different payoff amount was sent out by New South on July 17, 2007; the foreclosure file was received by New South's attorneys on August 12, 2008, with the sale set for September 15, 2008, which was cancelled. A letter sent by New South's attorneys to [Pugh] on October 31, 2008 showed the payoff was $92,483.28 ([*with*] *New South's counsel acknowledging it was not sufficient to serve as a notice of default*); another letter dated November 3, 2008 (which did not show the payoff amount, thus not sufficient) setting another sale date for December 8, 2008, which was reset; and finally, correspondence dated December 23, 2008 simply informing [Pugh] of the foreclosure sale [set] for January 6, 2009, giving [Pugh] only *thirteen days notice* of

-7-

the ultimate foreclosure sale. Thus, the sale was invalid and the lower court should be reversed.

(Emphasis and parenthetical information in original.)

Pugh accurately summarizes the procedural history, including the dates of the relevant notices and other correspondence, leading to the sale of her properties. We must take issue, however, with Pugh's conclusion that on these facts, an invalid foreclosure is shown. The gist of Pugh's argument that she was not provided with adequate notice of default depends on her position that the delay between July 2007, the date of the most recent notice of default, and the institution of the foreclosure process in September 2008, somehow rendered the notice of no effect. Neither at trial nor on appeal has Pugh offered any support for this position. At trial, Pugh moved to dismiss at the close of New South's proof and the following exchange took place:

> Counsel [for Pugh]: [T]he first acceleration letter [was] sent June 21, 2007, the second was sent July 10, 2007, and almost an entire year goes by, and one of the debtors, . . . her husband, passed away, and instead of working with [Pugh] and sending her what I believe to be – they should have sent another default letter, in my humble opinion.
>
> *   *   *
>
> And it's my opinion and argument that you can't just put a letter of acceleration out there and have it extend forever. You need to respect the rights of the borrower, send another notice of default before you accelerate, give the thirty days to cure before you accelerate and before you invoke the power of sale.
>
> THE COURT: Again, can you cite to any statute or any case law that says that if a foreclosure sale is not conducted within x number of days of whether it be the initial notice of default or the notice of the trustee's sale, whatever it is, that, therefore, you cannot proceed with the sale in the absence of renoticing it?
>
> Counsel: I can't other than maybe the equitable argument of latches. That's all I have.

The evidence shows that Pugh received multiple notices of default and intent to

accelerate from New South that contained the specific information expressly required by the deed. The July 10, 2007, default notice informed Pugh (1) of her default; (2) that payment of $4,673.49 was required within 30 days, on or before August 9, 2007, to cure the default; (3) and that failure to cure the default on or before the specified date would result in acceleration of the unpaid balance of $65,359.95, and referral for foreclosure, "which may lead to the sale of the property."

As can be readily seen, the July 10 notice contained all of the information required by the deed of trust. We thus reject Pugh's argument, unsupported by any authority, that because the foreclosure process was not initiated until over a year later, "this notice either expired, or New South was required by law to send out a new notice of default, . . . . with foreclosure to follow." We are unpersuaded by Pugh's contention that the delay between the giving of the default notice and the foreclosure proceedings left her "trying to determine the amount of her payoff, calling both [New South] and their attorneys . . . to get an accurate and correct payoff figure, something she was never able to accomplish because of their lack of cooperation." As the trial court recognized, New South provided the required notice of default, and Pugh therefore had the necessary information by which she could have cured the default by tendering the specified payment within 30 days. In our view, the difficulties Pugh encountered in her dealings with New South and/or its counsel in attempting to avoid foreclosure cannot be attributed to any deficiencies in the default notices provided, but rather to her refusal or inability to tender the required payment to cure the default.

Lastly, at trial, Pugh strenuously urged that the foreclosure sale was voided by the Trustee's decision to postpone the sale, initially scheduled for December 8, to January 8, 2009, with an announcement to that effect at the time and place of the sale. On this appeal, Pugh simply reiterates that "New South's attorney stated after the December 8, 2008 sale was postponed, he made a conscious decision to simply announce at that sale date that it would be continued until January 6, 2009." The deed of trust required New South to **"**give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by applicable law," and to mail a copy of the sale notice to Pugh. In turn, Tenn. Code Ann. § 35-5-101(a) & (b) provide that the trustee shall give notice of a foreclosure sale by public advertisement of the sale "made at least three (3) different times in some newspaper published in the county where the sale is to be made," and that the "first publication shall be at least twenty (20) days previous to the sale." In addition, the trustee or lender shall send notice to the borrower on or before the first date the sale is advertised. *See Id.* § 35-5-101(e).

The record reflects that the foreclosure sale initially set for December 8 was properly noticed and advertised and a copy of the published advertisement was sent to Pugh via certified letter on November 3, 2008, all in accordance with the provisions of Section 35-5-

101. Pugh fails to support her conclusory allegation that "the properties were ultimately foreclosed . . . with inadequate notice." More specifically, we conclude that Pugh has failed to demonstrate any irregularity or impropriety regarding the manner in which the foreclosure sale was noticed or advertised. To the extent she contends that the sale should have been renoticed and readvertised when it was postponed from December to January, her argument is to no avail. The statute itself provides that "[t]he failure to comply with the advertisement provisions in the statutes regarding trust deed sales, in and of itself, does not render a sale void or voidable." *Conway v. E. Sav. Bank, FSB*, No. W2005-02919-COA-R3-CV, 2006 WL 3613605 at * 6 (Tenn. Ct. App. W.S., filed Dec. 11, 2006); Tenn. Code Ann. § 35-5-106. Thus, in *Conway*, this Court affirmed the chancery court's decision upholding a foreclosure sale under nearly identical circumstances[2] to those presented herein; the chancery court held that "the Bank's failure to re-advertise three times, twenty days prior to the *rescheduled* foreclosure date does not render the sale irregular or unfair, and it does not warrant setting aside the foreclosure sale." *Id.* (Emphasis added).

On our review, we conclude that the evidence preponderates overwhelmingly in support of the trial court's findings that "New South gave [Pugh] proper notice, under the Tennessee statutes and its Deed of Trust, of the foreclosure sale originally scheduled on December 8, 2008," and that "a foreclosure sale properly advertised according to the terms of the foreclosure statutes may be postponed without readvertisement in accordance with the precise terms of the statute. . . ." The court did not err in its conclusion that there was a valid foreclosure to support issuance of the detainer warrants sought by New South.

V.

The judgment of the trial court is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and for the collection of costs assessed below. Costs on appeal are taxed to the appellant, Brenda Pugh.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[2]In *Conway*, the foreclosure sale was twice postponed and ultimately held more than a year after the originally scheduled sale date without readvertisement or giving further notice.